UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRERNA SINGH,

　　　　　　　Plaintiff,

　　v.

MEETUP LLC and DAVID SIEGEL,

　　　　　　　Defendants.

Case No:

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Prerna Singh ("Plaintiff" or "Singh") hereby alleges as follows against Defendants Meetup LLC ("Meetup" or the "Company") and David Siegel ("Siegel") (collectively, "Defendants"):

**PRELIMINARY STATEMENT**

1.　　On June 9, 2023, Meetup unlawfully fired Prerna Singh, Vice President, Product, and Head of Member Growth, during her job-protected maternity leave.

2.　　Throughout her employment, Singh was a top performer who consistently received positive performance evaluations and feedback. She was promoted to Vice President of Product in February 2022, after less than two years with the Company. Her performance was also rewarded with multiple raises, bonuses and stock option grants.

3.　　In early 2023, Singh was given a new position as the head of Member Growth, in connection with a company-wide reorganization to a vertical business unit structure. David Siegel, Meetup's Chief Executive Officer (CEO), told her that she was a great fit for this role and that he was confident she would succeed.

4.　　On February 26, 2023, Singh gave birth to her first child. She was approved for job-protected maternity leave from February 27, 2023 through July 14, 2023, through a combination of FMLA, short-term disability benefits and New York Paid Family Leave.

1

5.     On June 9, 2023, Singh was unexpectedly fired during her maternity leave.

6.     During the June 9, 2023 termination call, Siegel claimed that Singh's role was being eliminated and that she was being fired for poor performance.  However, Singh had a strong performance track record prior to starting maternity leave, and she was never given any warning that her job could be in jeopardy.  Incredibly, Siegel was unable to identify the alleged performance issues that led to the decision to terminate, and he admitted that he needed to review the performance documentation again.

7.     Moreover, Singh's position was not truly eliminated.  Singh's temporary maternity leave replacement was taking over her position permanently.  Siegel said he would consider bringing Singh back to lead Member Growth, pending his review of her performance documentation, further underscoring that her job still existed.

8.     Singh's employment was nevertheless terminated effective July 14, 2023, the last day of her job-protected maternity leave.

9.     Unfortunately, Singh's unlawful termination is not surprising.  Throughout her employment, Siegel marginalized Singh and treated her less favorably than similarly situated male colleagues. Moreover, upon information and belief, a number of employees have complained about discriminatory conduct and the hostile work environment at Meetup

10.     Ironically, Siegel wrote a leadership book that covers topics such as "fostering a healthy workplace culture."  Meetup promotes Siegel's book and opportunities to book Siegel as a speaker on the Meetup website.  Siegel is apparently more concerned with using the company platform for self-promotion than developing the "healthy workplace culture" that he claims to be an expert on for his own employees.

## NATURE OF THE CLAIMS

11.    Singh brings this action to remedy sex and pregnancy discrimination and retaliation in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, et seq., ("FMLA"), the New York State Human Rights Law, Executive Law § 290 et seq. (the "NYSHRL"), and the Administrative Code of the City of New York § 8-107 et seq. (the "NYCHRL").

## JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law. This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

14.    On October 25, 2023, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of 42 U.S.C. § 2000e et seq, Title VII of the Civil Rights Act of 1964 ("Title VII"), as well as Title VII as amended by the Pregnancy Discrimination Act ("PDA").  After the EEOC issues a Notice of Right to Sue, Plaintiff will amend this Complaint to add discrimination and retaliation claims under Title VII and the PDA.

15.    Pursuant to the Administrative Code of the City of New York § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the

New York City Law Department, Office of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of this action.

16.     Any and all other prerequisites to the filing of this action have been met.

## PARTIES

17.     Plaintiff Prerna Singh is a resident of New York, New York.  Prior to her unlawful termination, she was employed by Meetup as Vice President ("VP"), Product and the head of Member Growth.

18.     Defendant Meetup LLC ("Meetup") is a Delaware company with its principal place of business in the state of New York.  Meetup is an online platform that enables users to find others with common interests and organize events in-person and online.  At all relevant times herein, Meetup was Plaintiff's "employer" under all relevant statutes.

19.     Defendant David Siegel ("Siegel") is a resident of the state of New York.  He is the Chief Executive Officer (CEO) of Meetup.  At all relevant times herein, Siegel exercised decision making authority over Plaintiff, including the ability to hire, fire, demote or promote Plaintiff.  As such, Siegel was Plaintiff's "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### *Meetup Hires Singh as Senior Director of Product*

20.     Singh is an accomplished product leader and manager with over a decade of experience in the technology industry.

21.     Prior to joining Meetup, Singh held product leadership roles at various consumer startups, focused on driving audience and customer growth and scaling businesses while managing product management, design, engineering and data science teams.

22.    Singh has a Bachelor of Science from Carnegie Mellon's Tepper School of Business in Business Administration and Human Computer Interaction, with a minor in Engineering Studies.

23.    In or around April 2020, Singh began providing consulting services to Meetup.

24.    In or around August 2020, Meetup offered Singh a full-time position as Senior Director of Product.

25.    In conjunction with the offer, Siegel told Singh that Meetup was in a legal dispute with its former female VP, Product regarding her termination.  Siegel explained that Singh might need to start with a lesser "Director" title while the dispute was pending.

26.    In hindsight, Siegel's willingness to manipulate positions to mitigate Meetup's litigation risks should have been a red flag.

27.    On or about August 18, 2020, Singh received an offer letter with a start date of September 14, 2020.  Her job title was listed as "Director of Product," which would "be reviewed within 4 months for a change in title to Senior Director."  The offer letter included a Senior Director level salary and stated that there would be no compensation adjustment when her title was formally changed.

28.    On or about September 1, 2020, Siegel told Singh that her title change was much more likely to be "earlier than later" and "all moving forward very well there," referring to the dispute with the former VP, Product.

29.    Before her start date, Siegel approved "Senior Director" as Singh's official title.

30.    On or about September 14, 2020, Singh began her employment as Meetup's Senior Director of Product. She reported directly to Daniel Pardes, who had been recently promoted to VP, Product.

31.     Singh excelled in her role as Senior Director of Product.

32.     Singh created a new product operations framework, implemented key process changes to increase the velocity and impact of the product management function, and developed impactful strategic initiatives.

33.     Singh was also responsible for building out the product & design teams, which she expanded with key hires in her first few months.

34.     Meetup recognized Singh's performance as Senior Director with compensation, bonuses, stock options and positive evaluations.

35.     In February 2021, after only six months on the job, Singh received a salary increase and stock option grant, in recognition of her performance.

36.     Siegel and Pardes commended Singh's performance on many occasions.

37.     Seigel regularly invited Singh to weekly Leadership Team meetings, quarterly board meetings and Leadership Team offsites, despite Singh not being on the Leadership Team at the time.

38.     Pardes gave Singh a positive annual performance evaluation in October 2021. Among other things, Pardes described Singh as one of "Meetup's best leaders" and told her that her plan and goals were "awesome."

39.     Singh received a discretionary performance bonus for the 2021 calendar year, which was paid out in January 2022.

***Meetup Promotes Singh to Vice President of Product***

40.     On or about February 7, 2022, Meetup promoted Singh to Vice President (VP) of Product, after only a year and a half as Senior Director.  She also received a raise of over 15% in

her base salary, a retention bonus, and an additional grant of stock options.  With this promotion, Singh became a member of Meetup's Leadership Team.

41.    As VP, Product, Singh reported to Rajib Ahmed ("Ahmed").  Ahmed was Meetup's Chief Technology Officer (CTO).  He was also given the title of Chief Product Officer (CPO) starting in February 2022.

42.    Singh continued to excel as VP, Product, shepherding some of Meetup's biggest launches in recent company history, including the organizer app, event chat, donation feature, and new monetization opportunities. She also led all product and design diligence during Meetup's acquisition process, creating documentation and presenting to potential buyers.

43.    Ahmed recognized Singh's accomplishments with a positive annual performance evaluation in October 2022.  In the review, Ahmed applauded Singh for adapting well to her new leadership role and highlighted "many successes" from the last six months.

44.    Ahmed documented positive feedback for Singh on various other occasions.

45.    For example, on November 18, 2022, Ahmed commended Singh's performance in Lattice, a third-party app used by Meetup to celebrate outstanding employee performance, and elected to share his praise for Singh with the entire organization over Slack.  Ahmed wrote:

> Praise:
> Over the last few weeks, Prerna has just been instrumental in making our product offsite successful, helping outline 2023 product strategy goals, and taking all this on with many reporting and data requests that are all due yesterday.
> At all times, [Prerna] has led with empathy, inviting change, and constantly sharing what we know and don't know (super important) with our teams. Very proud of the commitment and leadership shown."

46.    Singh received a discretionary performance bonus for the 2022 calendar year, representing 100% of her target bonus, which was paid out in December 2022.  She also received a salary increase in early 2023.

### *Meetup Places Singh in a New Position as Head of Member Growth*

47.    On or about December 15, 2022, Siegel and Ahmed met with Singh to discuss potential changes to Meetup's business structure.

48.    Siegel shared his plan to move to a "vertical" business unit structure, in which the company would be organized around vertical market segments rather than traditional departments.

49.    Siegel told Singh that she would be the head of Member Growth, one of four new verticals.

50.    Singh asked Siegel what the vertical structure would mean for her career and for her team.  She said it was important to her that she continued to lead a department and wanted to know if she would still be leading a department with this change.

51.    Siegel assured Singh that she would still be in an equivalent lead-level role.  He told her that head of Member Growth was equivalent to being the General Manager of the business unit.  He explained that, as head of Member Growth, she would be managing day to day operations and would serve as the key decision maker for the Member Growth business unit.  He said the position would look great on her resume when she was "CEO one day."

52.    Siegel told Singh that he had "full confidence" she would succeed as head of Member Growth.

### *Singh Begins Her Role as Head of Member Growth*

53.    Singh began functioning as the head of Member Growth in early 2023.

8

54.    In January 2023, Singh began developing detailed strategic plans for the Member Growth business unit and prepared to transition the new team.  She spent weeks preparing the "Member Growth 2023 Strategy" slide deck documenting her strategy and plans.  Singh also prepared a responsibility matrix outlining roles and responsibilities for the Member Growth team.

55.    On January 27, 2023, Singh shared the "Member Growth 2023 Strategy" slide deck with Siegel.  Seigel provided positive feedback on her strategic plans and gave no indication of any issues with her performance.

56.    On January 31, 2023, Singh and Ahmed had a full day meeting offsite to discuss Member Growth strategy. Ahmed commended her presentation and told her that she was much further along than the other vertical leads.

57.    Singh also began working directly with the Member Growth team in or around January 2023.  For example, on or about January 23, 2023, she opened communication with the Member Growth team leads with a "Welcome" email announcing initial plans and sharing the responsibility matrix.

58.    Over the next few weeks, Singh met regularly with the Member Growth team leads as she worked on defining roles for each team member, including herself, establishing and communicating Objectives and Key Results targets (OKRs) for Q2 2023, and developing tactics for Q2 2023 roadmap planning.

59.    Singh also hosted a two-day Member Growth Vertical Kickoff for the entire Member Growth vertical team in February 2023.  This virtual offsite was attended by the Member Growth team leads as well as engineers, quality assurance (QA), and data science team members. Ahmed attended portions of the Vertical Kickoff as well.

60.    On February 8, 2023, Meetup formally announced the new vertical structure during an all-hands meeting.  Singh was named as the VP-level owner for Member Growth.

61.    At Siegel's request, Singh presented the Member Growth vertical strategy to Meetup's Leadership Team on February 15, 2023.  No other vertical lead was asked to present a comprehensive strategy to the Leadership Team at that time.  Siegel, Ahmed and other attendees commended her presentation.

62.    Just a few days before Singh's maternity leave began, Ahmed documented praise for Singh's initial work leading Member Growth and shared the feedback with the entire organization over Slack.  Specifically, on February 14, 2023 Ahmed wrote:

> Praise:
> Prerna – incredible how you've been managing the upcoming Member Growth working sessions, forward looking planning and focus to all the process changes for the team.
> > Keeping it real and involving everyone early #ElevatePeople
> > Stepping in as needed to help with documentation, game planning, OKR brainstorming and more #StepUp
> > Showing empathy, support and help along the way while keeping the focus on making an impact for our targets #FocusOnImpact

### *Siegel Subjected Singh to Hostile Work Environment on the Basis of Sex*

63.    Despite Singh's solid performance, Siegel treated Singh less well than her male colleagues throughout her employment and subjected her to a hostile work environment on the basis of sex.

64.    In or around September 2021, Siegel told Singh that he evaluates employees based on "perceptions" and that he might have "biases" in his assessments of her based on his own perception.  Upon information and belief, Siegel's biases favored male employees over females.

65.    Indeed, Siegel marginalized Singh on the basis of sex by, among other things, crediting male employees with some of her accomplishments, ignoring her contributions and/or

10

claiming them as his own, assigning projects to male employees over her, and interrupting her in meetings.

66.    For example, in September 2021, Siegel told Singh that she should be "hiring more" and suggested that Ahmed was materially outperforming her in recruiting new team members over the last year.  In fact, Singh had successfully hired a substantially similar or equal number of candidates as Ahmed in the same period.    Siegel was unfairly discounting Singh's accomplishments in comparison to Ahmed, based on Siegel's own admittedly biased perceptions. Further, upon information and belief, Siegel was giving Ahmed credit for hiring candidates who Singh had actually recruited and/or hired.

67.    At various times, Siegel discounted or ignored Singh's ideas in meetings, only to later claim them as his own.  As one example, during a leadership team meeting in around October 2022, Singh presented a strategic idea that was largely dismissed by Siegel.  Siegel subsequently proposed the same concept as his own, ignoring Singh's contribution, and assigned a male employee, rather than Singh, to take the lead on this project.  In contrast, when Ahmed (male) shared business ideas, Siegel acknowledged Ahmed's contributions and gave him the opportunity to him to take the lead on the resulting initiatives or projects.   Upon information and belief, Siegel did not steal ideas from male employees as he did to Singh.

68.    Siegel also marginalized Singh by interrupting her when she presented or spoke during weekly meetings.  Siegel did not interrupt her male counterparts to the same extent or as frequently as he interrupted her.

69.    Siegel's mistreatment of Singh as compared to her male colleagues created a hostile work environment on the basis of sex.

*Singh Takes FMLA and NYPFL Leave*

70.     On February 26, 2023, Singh gave birth to her first child.  She took a job-protected leave of absence beginning February 27, 2023 through July 14, 2023.

71.     Singh took twelve weeks of FMLA leave, beginning February 27, 2023 through May 19, 2023.

72.     Singh was approved for eight weeks of New York state short-term disability benefits, from February 27, 2023 through April 21, 2023.

73.     Following her short-term disability benefits, Singh was approved for twelve weeks of New York State Paid Family Leave (NYPFL), beginning April 24, 2023 through July 14, 2023.

*Singh is Unexpectedly Replaced During Maternity Leave*

74.     In the two months leading up to her leave of absence, Singh had multiple conversations with Siegel, Ahmed and Suvarna Joshi ("Joshi"), Head of People, about her upcoming leave and the transition to the vertical structure.  There were no concerns raised about Singh's performance or warnings that her job was in jeopardy in any of these conversations.  Nor was it ever questioned, to Singh's knowledge, that she was the right fit to be the owner of Member Growth.

75.     Prior to her leave, Singh was told that Ahmed and one of her direct reports on the Member Growth team would cover her job duties and support her team in her absence.

76.     However, Meetup apparently changed plans after Singh began her leave.  In mid-March, Meetup announced internally that Maria Vradi ("Vradi"), Director of Strategy, would temporarily join the team in Singh's role while she was on leave.  Vradi was not previously part of the Member Growth team.

12

77.    Later that month, Meetup disclosed to its Board of Directors that Vradi was acting as the Member Growth vertical owner only "until Prerna return[s] from Mat leave" and that "Prerna will resume upon her return."

***Meetup Fires Singh During Maternity Leave***

78.    On multiple occasions, Meetup represented to Singh, its workforce, and its Board of Directors that Singh was the new vertical owner of Member Growth.  These representations were made both before and during Singh's maternity leave.

79.    No concerns were ever raised about Singh's ability to succeed as the head of Member Growth.  To the contrary, Siegel said he was confident she would succeed in the role, and Singh received positive feedback on her performance in the new role in January and February 2023.

80.    It therefore came as a complete shock when Singh was abruptly terminated during her maternity leave.

81.    Siegel fired Singh over Zoom on June 9, 2023, over a month before the end of her maternity leave.  Joshi was also in attendance.

82.    Siegel provided false and pretextual reasons for the decision to terminate Singh. During the Zoom termination meeting, he claimed (1) Singh's role as VP, Product was being eliminated; and (2) that Singh was no longer a fit to lead Member Growth based on past performance concerns.

83.    Singh's job was not, in fact, eliminated.  Vradi remains in Singh's position as head of Member Growth, performing the same job duties that Singh had done leading up to her maternity leave.  Siegel manipulated job titles by claiming the VP job title was eliminated, in an

effort to avoid or minimize legal consequences, similar to the way he manipulated Singh's job title in her offer letter when Meetup was involved in a dispute with the prior VP, Product.

84. To conceal his unlawful motives, Siegel claimed that Ahmed's position as Chief Product Officer (CPO) was also being eliminated and that there would be no "product leadership roles" at Meetup going forward. This was false. Months later, Ahmed still retains the CPO title and continues to function as the primary product leader at Meetup.

85. It was also false that Singh had performance issues that could warrant her termination.

86. During the termination call, Singh asked Siegel to explain the performance concerns that led to the decision. Siegel was flabbergasted. He did not identify or articulate a single performance issue on his own.

87. Siegel spent multiple awkward minutes retrieving Singh's October 2022 performance evaluation, while she and Joshi waited on the Zoom. Once he found it, he read aloud a few bullet points which had been highlighted as "areas to continue to focus on over the next months and ongoing." These items were not framed as shortcomings or problems with Singh's prior performance in her review. Siegel did not read or acknowledge the "many successes" and positive feedback highlighted in the same evaluation.

88. As Siegel floundered, Joshi interjected that Ahmed had allegedly documented negative feedback for Singh in January 2023. When Singh said that she had no recollection of such a meeting, Joshi admitted that no written documentation was provided to Singh.

89. Singh told Siegel and Joshi that she felt like she was being "punished for taking mat leave." She had been operating in the Member Growth role for nearly two months before

14

going on leave and had received positive feedback on her work.  It seemed obvious that, had she not taken maternity leave, she would not have been terminated.

90.    After Singh's protected complaint of discrimination, Siegel quickly started to backtrack and told Singh she come back to Meetup "on a performance plan."  If her position had been eliminated for legitimate business reasons, it would not be possible to bring her back, performance plan or not.  Thus, Siegel revealed that the position elimination was nothing more than pretext.

91.    Siegel also admitted that he needed to review the performance feedback in more detail, revealing the performance rationale was also pretextual.  He said he would "take a more detailed look…. and it's not like I didn't look… but I can take a more detailed look of what actual documentation that we have and confirmation of conversations."

92.    Siegel also told Singh "if you do end up coming back, let's just say that, if you do, nothing would make, I want to be clear, nothing would make me happier than Member Growth killing it, and like and nothing would make me happier than Member Growth killing it and for you to succeed in the role."  Again, Siegel confirmed that Singh's position was not truly eliminated, and that the decision had not been based on her performance.

93.    Nevertheless, Singh was terminated effective July 14, 2023, the last day of her job protected NYPFL leave.

94.    By firing her during her maternity leave, Defendants treated Singh less favorably than male employees and employees who did not become pregnant or take maternity leave.

95.    Defendants also harassed Singh on the basis of sex, gender and pregnancy by subjecting her to false and baseless performance criticisms as a pretext for her termination during her maternity leave.  Singh would not have been subjected to baseless attacks on her performance

15

or the resulting damage to her reputation had she not become pregnant or taken maternity leave following childbirth.

***Meetup Further Discriminates and Retaliates Against Singh By Interfering with Her Statutory Benefits***

96.    After Singh's protected complaint, Meetup retaliated against her by depriving her of New York State Paid Family Leave (NYPFL) benefits.

97.    Under New York State law, Singh was entitled to twelve weeks of NYPFL benefits. She was approved for such benefits from April 24, 2023 through July 14, 2023.

98.    Upon information and belief, Meetup claimed that it would pay 100% of Singh's salary for the duration of her NYPFL.  Meetup's insurance carrier therefore paid statutory NYPFL benefits directly to Meetup, rather than Singh, as a subsidy towards her full salary.

99.    Meetup stopped paying Singh's full salary on or about June 21, 2023, just weeks after her protected discrimination complaint.  Meetup claimed that Singh was on "unpaid" leave even though she was approved for NYPFL benefits through July 14, 2023.

100.    Singh received no NYPFL benefits from June 22, 2023 through July 14, 2023, due to Meetup's discriminatory and retaliatory conduct.

***Defendants Retaliate Against Singh By Attempting to Silence and Intimidate Her***

101.    Defendants have further retaliated against Singh by attempting to intimidate her, silence her and interfere with her right to file her claims with the EEOC and in Court.

102.    Under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), "at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute… no predispute arbitration… shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute."

103.    The EFAA expressly provides that the Court, not an arbitrator, has the power to determine any gateway issues related to the application of the EFAA or the validity or enforceability of the arbitration agreement.

104.    On or about October 4, 2023, Defendants through their counsel Douglas Klein, Jackson Lewis P.C., preemptively filed a Statement of Claim ("Arbitration Demand") with the Judicial Arbitration and Mediation Services ("JAMS") against Singh, seeking enforcement of a mandatory predispute arbitration agreement, which Singh was required to sign when she was hired. Singh had not filed any action or proceeding against Defendants at the time.

105.    Defendants and their counsel, Klein, were aware that Singh's claims included allegations of unlawful harassment on the basis of sex, gender and pregnancy, when they filed the Arbitration Demand.

106.    Nevertheless, in the Arbitration Demand, Defendants sought a declaratory judgment that Singh is required to "bring any claims against Claimants in binding JAMS arbitration," in contravention of the EFAA and interfering with Singh's right to file a charge of discrimination with the EEOC or another government agency.

107.    Defendants' Arbitration Demand was intended solely to harass and intimidate Singh and to interfere with her protected rights.  Indeed, Defendants demanded relief including attorneys' fees and costs for their preemptive arbitration filing.  The costly threat of having to pay Defendants' attorneys' fees was intended to deter Singh from filing in Court and/or with the EEOC.

108.    Defendants intentional disregard of Singh's rights and their intimidation efforts constitute further retaliation against her.

### FIRST CAUSE OF ACTION
**(Interference in Violation of the FMLA)**
*Against All Defendants*

109.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

110.    At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the FMLA. Similarly, Defendants were "covered employers" within the meaning of the FMLA.

111.    By the actions described above, among others, Defendants interfered with Plaintiff's rights under the FMLA.

112.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

113.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

114.    Defendants' unlawful and discriminatory actions constitute reckless intentional, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

### SECOND CAUSE OF ACTION
**(Retaliation in Violation of the FMLA)**
*Against All Defendants*

115.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

116.    At all times relevant herein, Plaintiff was an "eligible employee" within the

meaning of the FMLA. Similarly, Defendants were "covered employers" within the meaning of the FMLA.

117. By the actions described above, among others, Defendants retaliated against Plaintiff for exercising her rights under the FMLA by, *inter alia*, terminating her employment.

118. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

119. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

120. Defendants' unlawful and discriminatory actions constitute reckless intentional, malicious, willful and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

### THIRD CAUSE OF ACTION
**(Discrimination in Violation of the NYSHRL)**
*Against All Defendants*

121. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

122. By the actions described above, among others, Defendants discriminated against Plaintiff and subjected Plaintiff to a hostile work environment on the basis of her sex, gender, pregnancy and/or familial status in violation of the NYSHRL by treating her differently from and less favorably than similarly situated male employees and/or employees who did not become pregnant.

123. As a direct and proximate result of Defendants' unlawful and discriminatory

19

conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

124.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiffs are entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
**(Retaliation in Violation of the NYSHRL)**
*Against All Defendants*

125.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

126.    By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the NYSHRL.

127.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

128.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiffs are entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION
**(Aiding and Abetting in Violation of the NYSHRL)**
*Against Defendant Siegel*

129.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

20

130.    Defendant Siegel aided, abetted, incited, compelled and/or coerced the discrimination, harassment and retaliation against Plaintiff in violation of the NYSHRL.

131.    As a direct and proximate result of Defendant Siegel's unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

132.    As a direct and proximate result of Defendant Siegel's unlawful conduct, Plaintiff has suffered and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

133.    Defendant Siegel committed these unlawful acts with willful negligence, or recklessness, or a conscious disregard of Plaintiff's rights for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
*Against All Defendants*

134.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

135.    By the actions described above, among others, Defendants discriminated against Plaintiff and subjected Plaintiff to a hostile work environment on the basis of her sex, gender, pregnancy, sexual reproductive health decisions and/or caregiver status in violation of the NYCHRL by treating her differently from and less favorably than similarly situated male employees and/or employees who did not become pregnant.

136.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

137.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

138.    Defendants committed these unlawful acts with willful negligence, or recklessness, or a conscious disregard of Plaintiff's rights for which Plaintiff is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
*Against All Defendants*

139.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

140.    By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the NYCHRL.

141.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

142.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

143.    Defendants committed these unlawful acts with willful negligence, or

22

recklessness, or a conscious disregard of Plaintiff's rights for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYCHRL)
*Against Defendant Siegel*

144.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

145.    Defendant Siegel aided, abetted, incited, compelled and/or coerced the discrimination, harassment and retaliation against Plaintiff in violation of the NYCHRL.

146.    As a direct and proximate result of Defendant Siegel's unlawful conduct, Plaintiff has suffered and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

147.    As a direct and proximate result of Defendant Siegel's unlawful conduct, Plaintiff has suffered and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

148.    Defendant Siegel committed these unlawful acts with willful negligence, or recklessness, or a conscious disregard of Plaintiff's rights for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against the Defendants for the following relief;

A.    A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate federal, state and city laws;

23

B.      A declaratory judgment that the arbitration agreement is unenforceable with respect to Plaintiff's case;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

F.      An award of liquidated damages in an amount to be determined at trial;

G.      An award of punitive damages in an amount to be determined at trial;

H.      An award of reasonable attorneys' fees and costs to the fullest extent permissible by law;

I.       Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages stated herein.

24

Dated: October 30, 2023
      New York, New York               Respectfully submitted,

                                    **KAUFMAN LAW FIRM PLLC**

                                    By:     /s Meredith L. Kaufman
                                              Meredith L. Kaufman

                                    250 W. 16th St., 2G
                                    New York, NY 10011
                                    Tel: 646.469.9180

                                    *Counsel for Plaintiff*

25